IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

MARY A. PEEL,
       Plaintiff,

vs.                                 Case No. 5:08cv173/RS/EMT

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,
       Defendant.
_____/

## REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. § 401, *et seq.*  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

I.      PROCEDURAL HISTORY

This suit involves an application for DIB, filed by Plaintiff on April 27, 2004, which was denied initially and on reconsideration (Tr. 20, 34–39, 42–44).  On June 13, 2006, following a hearing, an administrative law judge ("ALJ") rendered a decision in which he found that Plaintiff was not under a "disability" as defined in the Act (Tr. 18–26).  On March 24, 2008, the Appeals Council of the Social Security Administration denied Plaintiff's request for review (Tr. 4–7).  Thus,

the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court.  Ingram v. Comm'r. of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007); Falge v. Apfel, 150 F.3d 1320 (11th Cir. 1998).  This appeal followed.

II.     FINDINGS OF THE ALJ

On June 13, 2006, the ALJ made several findings that are relevant to the issues raised in this appeal (see Tr. 20–26), including the following:

1)      Plaintiff last met the insured status requirements of the Act on June 30, 2002 (hereafter "DLI," Plaintiff's date last insured).[1]

2)      Plaintiff has not engaged in substantial gainful activity ("SGA") at any time relevant to the ALJ's decision.

3)      Through Plaintiff's DLI, she had the following severe impairments: degenerative joint disease of the knee and chronic Eustachian tube dysfunction.

4)      Through Plaintiff's DLI, she did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5)      Through Plaintiff's DLI, she had the residual functional capacity ("RFC") to perform sedentary work.  She was limited in her ability to push and pull with her upper and lower extremities, and should have avoided kneeling, crawling, exposure to weather, extreme temperatures, wetness, humidity, noise, vibration, moving mechanical parts, electrical shock, exposure to high places, noxious fumes or odors, explosives, and toxic or caustic chemicals.  Additionally, Plaintiff should have stooped or crouched only occasionally.

6)      Through Plaintiff's DLI, she was unable to perform her past relevant work.

7)      Through Plaintiff's DLI, considering her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed.

8)      Thus, Plaintiff was not under a "disability," as defined in the Act, at any time through June 30, 2002, her DLI for Title II purposes.

---

[1]Thus, the time frame relevant to this appeal is June 1, 2000 (alleged onset) to June 30, 2002 (date last insured) (see Tr. 20, 22).

III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance, it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence.  Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  *Id*. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1.    If the claimant is performing substantial gainful activity, she is not disabled.

2.    If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.    If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.    If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5.    Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work.  20 C.F.R. § 404.1512.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.     PLAINTIFF'S PERSONAL HISTORY AND MEDICAL HISTORY[2]

A.     Personal History

Plaintiff was born on February 14, 1963, making her a "younger individual" during the time frame relevant to this appeal (Tr. 53) (*see* 20 C.F.R. § 404.1563).  She has a college education and served in the Marine Corps from August 15, 1986, through August 15, 1996, when she was separated from service due to medical problems and given a Veterans Administration ("VA") disability rating of 20% total, 10% for her knee disorders, and 10% for her back pain (Tr. 53, 70, 325–29).  At the time of Plaintiff's hearing before the ALJ she was working part-time as a career college instructor earning $7,600.00 a year (Tr. 1219–20).  Plaintiff's past relevant work includes work as a supply officer and agricultural specialist (Tr. 1232–33).  Plaintiff generally alleges that she cannot stand for more than fifteen (15) minutes due to back and knee pain and swelling, she has to urinate every one to two hours, and she averages two migraines a month that each last two days (Tr. 86, 102).  Plaintiff also reports frequent sinus infections and three to four doctor visits per month, some requiring out of state travel (Tr. 86).

At her hearing before the ALJ Plaintiff testified that she left her last job at the Department of Agriculture due to medical problems, including knee discomfort and swelling (Tr. 1221).  She stated that her total 70% VA disability rating was related to her knee, back, and urinary incontinence (Tr. 1223–24), but she is able to stand or walk thirty minutes (Tr. 1230–31).  Plaintiff also testified that she has had trouble with headaches since about 2000, waking up with headaches in the morning with vomiting, photosensitivity, and severe pain (Tr. 1225).  She stated that even with medication the headaches last a day or two, but they can last up to three days, and they occur one to two times a month (*id.*).  Plaintiff testified that when she gets a migraine she covers her head and usually does not get up for six hours (Tr. 1226).  Plaintiff further testified that noisy environments bother her (Tr. 1229).  Plaintiff noted that she has had urinary incontinence since her 1994 hysterectomy, and she sometimes must use protective garments (Tr. 1226).  She also has two to three doctors appointments a month for her various medical conditions, including out-of-town appointments at VA facilities in Biloxi, Mississippi, and Gainesville, Florida (Tr. 1227–28).

---

[2]Unless otherwise noted, the information in this section is derived from Plaintiff's memorandum in support of her complaint (Doc. 16).

B.      Medical History

On August 24, 1995, orthopedic surgeon Michael E. Brunet, M.D., reviewed photographs taken during Plaintiff's right knee arthroscopy and opined that Plaintiff had a degenerative tibia and femoral condyle, indicating "ongoing degenerative breakdown" (Tr. 135).  He noted that Plaintiff would need a joint replacement for pain relief before she is fifty-five or sixty years old (*id.*).  On April 15, 1996, Dr. Brunet diagnosed a probable herniated disc at the S1 nerve root causing radicular pain (Tr. 134).

On November 22, 1996, Plaintiff was evaluated by a nurse practitioner for a VA compensation evaluation regarding her urinary incontinence (Tr. 501–03).  Plaintiff reported voiding every four to six hours with "dribbles" between voiding and noted that she has to go to the bathroom immediately or she wets herself because she cannot hold urine (Tr. 501).  Plaintiff also reported using sanitary pads to prevent wetting her clothes (*id.*).  On December 5, 1996, Plaintiff again reported urinary incontinence and urgency and was prescribed ditropan (Tr. 323).

A lumbar magnetic resonance imaging ("MRI") on March 17, 1997, revealed mild to moderate spinal stenosis at L4-L5, mild bulging of the L4-L5 disc with hypertrophy of facet joints, and mild bulging at L5-S1 (Tr. 136, 313).

On May 5, 1997, Plaintiff again reported urinary urgency, but the ditropan was discontinued because Plaintiff stated it had not been helpful (Tr. 312).  On January 5, 1998, Plaintiff reported urinary urgency with occasional incontinence and additional stress incontinence; a gynecological consultation was scheduled (Tr. 299).  At the consultation, on February 25, 1998, Plaintiff again complained of having urinary incontinence since her hysterectomy (Tr. 307).  She reported urgency all day with occasional incontinence if she cannot get to the bathroom and noted that the Ditropan did not provide relief (*id.*).  Plaintiff, however, was again prescribed Ditropan and instructed to do bladder training with voids every three hours (*id.*).  Plaintiff was seen on April 22, 1998, for urinary urgency and stress incontinence; she was prescribed Ditropan and instructed to follow timed voids every two to three hours (Tr. 260).

Plaintiff underwent functional endoscopic sinus surgery on November 15, 1999, during which her left maxillary sinus medial wall was removed (Tr. 189–90, 609).

On February 23, 2000, Plaintiff was informed that a total knee replacement was not a good option for her due to her age, and conservative treatment measures would be used (Tr. 465).  A right knee MRI on October 19, 2000, identified post-surgical, degenerative, and osteochondral changes with projecting bony spurring (Tr. 171–72, 370–71).  On November 6, 2000, R. Eugene Bass, M.D., reviewed the MRI and x-rays of Plaintiff's right knee and performed an examination for VA disability compensation evaluation purposes (Tr. 493–94).  Dr. Bass noted that Plaintiff had pain on range of motion testing and that "pain would further limit function ability during flare ups or with increased use as described" (Tr. 494).

On April 5, 2001, progress notes reveal that it had become necessary to remove an old "T-tube" and place a new one in Plaintiff's ear due to her Eustachian tube dysfunction ("ETD") (Tr. 158).  The replacement was performed on April 18, 2001 (Tr. 161, 426)

In a letter dated April 26, 2001, otolaryngologist Michael A. Hagmann, M.D., opined that Plaintiff's sinusitis and otitis media were chronic conditions and were service related (Tr. 142).

Progress notes dated October 9, 2001, reveal that Plaintiff returned for follow up regarding the T-tube replacement (Tr. 419).  At this visit Plaintiff reported "experiencing what she describes as migraine headaches every three weeks, during which she is photosensitve to light [but noting that her] headaches are sometimes relieved with saline irrigation and pheoridine" (*id.*).  Plaintiff's prescription for pseudoephedrine was renewed, and she was advised to return for follow-up in six months regarding the T-tube replacement (*id.*).  Plaintiff returned on October 22, 2001, complaining of facial discoloration (*see* Tr. 418), and on February 4, 2002, again noting dermatologic abnormalities (Tr. 415).  Lastly, on March 21, 2002, Plaintiff returned for follow-up regarding the T-tube replacement; she had "no complaints" except "occasional left fullness and itching" that was relieved with Floxin, and it was noted that Plaintiff's T-tube was "functioning well" (*id.*).

Although the file contains numerous additional medical records, most of those records are from well after Plaintiff's DLI, and they are summarized in the memorandum in support of Plaintiff's complaint (Doc. 16); thus, the remaining records are not summarized here.  Where pertinent, the additional medical records will be discussed, *infra*.

V.      DISCUSSION

Plaintiff raises four issues in the instant appeal.  First, Plaintiff contends the ALJ erred in failing to state the weight he accorded to the VA rating of 70 % disabled.  Second, Plaintiff contends the ALJ erred in finding her urinary problems and migraines non-severe and in failing to incorporate any limitations related to these impairments in the RFC.  Third, Plaintiff alleges that the ALJ erred in finding her less than fully credible.  Fourth, Plaintiff asserts that the ALJ erred at step five of the sequential evaluation by finding that Plaintiff could perform other work (*see* Doc. 16 at 1).

A.      VA Rating

Plaintiff contends the ALJ erred in failing to state the weight he accorded to the total VA rating of 70% disabled (Doc. 16 at 11–12).  Specifically, Plaintiff states, "[a]t the time of her application for benefits and date last insured, [Plaintiff] was deemed disabled by the VA due to service related knee disorders, back pain, and uterus removal" (Doc. 16 at 11 (referencing Tr. 133, 325–29)).  Plaintiff additionally states, "[a]lthough the combined percentage disability rating at [June 1, 2000,] the date of alleged disability onset[,] is not of record, [Plaintiff's] combined rating was increased to 70% as of August 2, 2004 due to increased problems with urinary incontinence and back pain" (*id.* (referencing Tr. 132–33)).  Although Plaintiff's specific ground for relief appears to concern the August 2004 VA ratings, the court will address all VA ratings that appear in the file, which were rendered on three different occasions.

On April 18, 1996, a Navy Hearing panel found Plaintiff physically unfit to perform her duties based on a meniscus tear in her right knee with knee pain (10% disabled) and low back pain (10% disabled), resulting in a total disability rating of 20% (*see* Tr. 325, 328).  It was also noted that Plaintiff had no limitation of range of motion and no ligamentous instability in the right knee, and an x-ray of the knee was normal (Tr. 328).  Similarly, it was noted that Plaintiff had full range of motion in the lumbar spine, negative straight leg raise, a normal neurologic examination, normal x-rays, a normal MRI, and only mild tenderness to palpation at the L4-5 level (*id.*).  On October 18, 2000, Plaintiff was again assessed by the VA, which resulted in a 30% disability rating based on the removal of Plaintiff's uterus, a 20% rating based on urinary incontinence, a 10% rating based on

Plaintiff's knee condition, and a 10% rating based on back strain (Tr. 495).[3]  Finally, the record reflects that as of August 2, 2004, Plaintiff was noted to be 40% disabled as a result of urinary incontinence and 20% disabled as a result of mechanical low back pain, with overall or combined ratings of 70% and 60%[4] (Tr. 132–33).

The ALJ did not mention any of the foregoing VA ratings in his opinion.  The question thus becomes whether the ALJ's failure to do so constitutes error that entitles Plaintiff to relief.  As this court is well aware, to be eligible for DIB an individual must meet Title II's earning requirement, and Plaintiff last met this requirement on June 30, 2002.  And, when an individual is no longer insured for Title II disability purposes, her medical condition is considered as of the date she was last insured.  *See, e.g.*, Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997) (citing Bastian v. Schweiker, 712 F.2d 1278, 1280 (8th Cir. 1983)).  Thus, the ALJ did not err in failing to mention or consider VA ratings assessed in August 2004, as they were assessed more than two years after Plaintiff's DLI.  Similarly, the ratings assessed in April 1996 are not probative of Plaintiff's condition during the relevant time frame, June 1, 2000 to June 30, 2002.  Indeed, an ALJ's duty to develop the record  generally requires that an ALJ develop a claimant's medical history for at least the twelve months preceding the month in which an application for DIB is filed, although in some circumstances development of an earlier period is necessary.  *See* 20 C.F.R. § 404.1512(d).  While Plaintiff has not alleged here that the ALJ failed to fully develop the record, the duty of the ALJ as described in Section 404.1512(d) suggests that twelve months of records are generally sufficient for a fair consideration of a claimant's impairment(s).  Thus, the VA ratings from April 1996, assessed approximately fifty (50) months prior to the alleged onset of Plaintiff's disability and approximately ninety-seven (97) months prior to April 27, 2004, the date Plaintiff filed her application for DIB, need not have been considered by the ALJ.

---

[3]The October 2000 record does not contain a total disability rating (*see* Tr. 495).  And, when a veteran has more than one impairment, the percentages from the various ratings are not simply added together to produce the combined rating (*see, e.g.*, Tr. 132).  Thus, Plaintiff's total or combined disability rating in October 2000 is unknown.

[4]It is unclear why Plaintiff was assessed with overall ratings of 70% and 60% on the same day, but the undersigned accepts, as Plaintiff contends, that she was assessed with an overall rating of 70% in August 2004.

As previously noted, however, the file contains VA disability ratings from October 2000 (30% disabled (removal of Plaintiff's uterus), 20% (urinary incontinence), 10% (knee condition), and 10%, (back strain)), which were assessed during the time frame relevant to this appeal but were not mentioned or considered by the ALJ. It is clear in the Eleventh Circuit that a disability rating by the Department of Veterans Affairs or Florida's Division of Workers Compensation although not binding on the Commissioner, is entitled to great weight, and that it is error for the Commissioner to ignore it. Falcon v. Heckler, 732 F.2d 827 (11th Cir. 1984) (holding that because Florida workers compensation disability law and Social Security disability law operate similarly, the ALJ must give great weight to a workers compensation decision); Bloodsworth v. Heckler, 703 F.2d 1233, 1241 (11th Cir. 1983) (holding that "findings of disability by another agency, although not binding on the [Commissioner], are entitled to great weight"); Rodriguez v. Schweiker, 640 F.2d 682, 686 (5th Cir. Unit A, March 25, 1981)[5] (holding that "a VA rating is certainly not binding on the [Commissioner], but it is evidence that should be considered and is entitled to great weight . . . and [in this case] should have been more closely scrutinized"); DePaepe v. Richardson, 464 F.2d 92 (5th Cir. 1972); Epling v. Comm'r of Soc. Security, 2009 WL 635788, *29 (M.D. Fla. March 11, 2009) (finding clear error where ALJ completely failed to mention the approval by the Florida Department of Labor and Employment ("FDL&E") of a mediated settlement agreement stating that the claimant was totally disabled, even though the agreement was different than a direct finding by the FDL&E). Here, because the October 2000 VA ratings contain no combined or total disability rating, the ALJ likely did not err by failing to consider the individual percentages, considering that Plaintiff was never characterized as totally disabled — before or after the time frame relevant to this appeal (in April 1996 she was assessed as 20% disabled, and in August 2004 she was assessed as 70% disabled). Cf. Rodriguez, 640 F.2d at 686 ("[a] VA rating of 100% disability [relating to the time frame under consideration] should have been more closely scrutinized by the ALJ"); DePaepe, 464 F.2d at 101 (error in failing to consider VA's rating of claimant "as 100 percent unemployable"). But, even if the ALJ erred, the undersigned concludes that any error was harmless. The October 2000 VA ratings relate to the removal of Plaintiff's uterus, urinary incontinence, right knee

---

[5]Decisions of the United States Court of Appeals for the Fifth Circuit decided prior to September 30, 1981 are binding precedent in the Eleventh Circuit. Bonner v. Pritchard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

condition, and back pain, but the ALJ was well aware of these impairments, as he discussed and considered each in his opinion.  Moreover, as discussed more fully below, the ALJ's findings relating to these impairments have substantial support in the record.[6]  *See* East v. Barnhart, 197 Fed. Appx. 899, 901 n.3 (11th Cir. 2006) (failure to mention psychologist's report harmless where findings in report were consistent with ALJ's ultimate determination).  Therefore, to the extent Plaintiff has raised an issue in this appeal regarding the ALJ's failure to consider the October 2000 VA ratings, Plaintiff is not entitled to relief.

     B.       Severity Findings at Step Two and RFC Determination

     Plaintiff next contends that the ALJ erred in finding her urinary problems and migraines non-severe and in failing to incorporate any limitations relating to these impairments in the RFC (Doc. 16 at 12–15).

     1.       Step Two Findings

     At step two of the sequential evaluation process, the claimant must prove that she is suffering from a severe impairment or combination of impairments which significantly limits her physical or mental ability to perform "basic work activities."  *See* 20 C.F.R. §§ 404.1520(c) 404.1521(a).  Basic work activities include: <u>physical functions</u> such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling, and capacities for seeing, hearing, and speaking; as well as <u>mental functions</u> such as understanding, carrying out, and remembering simple instructions; the use of judgment; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting.  20 C.F.R. § 404.1521(b).  An impairment can be considered non-severe "only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience."  Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984); *see also* Bowen v. Yuckert, 482 U.S. 137, 153 (1987) ("The severity regulation increases the efficiency and reliability of the evaluation process by identifying at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education and experience were taken into account").  Although the claimant carries the burden

---

[6]Plaintiff does not dispute all of the ALJ's findings regarding her impairments, such as his finding at step two that her back pain is a non-severe impairment.  Thus, only those findings that are in dispute will be discussed *infra*.

at step two, the burden is mild.  <u>McDaniel v. Bowen</u>, 800 F.2d 1026, 1031 (11th Cir. 1986) ( "Step two is a threshold inquiry. It allows only claims based on the most trivial impairments to be rejected.").  A claimant need only show that "her impairment is not so slight and its effect is not so minimal."  *Id.*

Here, in finding Plaintiff's urinary incontinence ("UI") non-severe, the ALJ noted that "the objective evidence fails to substantiate this complaint" (Tr. 23).  Plaintiff contends, however, that the "record is replete with references" to Plaintiff's ongoing difficulty with UI following her hysterectomy (which was performed in 1994) (Doc. 16 at 13; Tr. 1226).  Similarly, Plaintiff states that she was evaluated as early as 1996 for UI and continued to seek treatment therefor (Doc. 16 at 13 (referencing Tr. 131, 260, 299, 307, 312, 323, 500–03, 646, 648, 700, 821, 986, 1092–93)).

Before addressing Plaintiff's argument, the undersigned finds it helpful to reiterate that the time frame relevant to Plaintiff's claim for DIB is relatively short; that is, from June 1, 2000, through June 30, 2002.  And, as can be seen from the following summary, <u>all</u> of the records referenced by Plaintiff concerning her UI, and in support of her argument that it should have been found to be a severe impairment, are dated outside of the relevant time frame:

| | |
|---|---|
| Transcript 131 | Letter from Dr. Camperlengo dated September 27, 2005, noting that she had treated Plaintiff for UI since 2003. |
| Transcript 260 | Treatment record dated April 22, 1998. |
| Transcript 299 | Treatment record dated January 5, 1998. |
| Transcript 307 | Treatment record dated February 25, 1998. |
| Transcript 312 | Treatment record dated May 5, 1997. |
| Transcript 323 | Treatment record dated December 5, 1996. |
| Transcript 500–03 | Treatment records dated in November 22, 1996. |
| Transcript 646 | Treatment record dated December 30, 2002. |
| Transcript 648 | Treatment record dated March 3, 2003. |
| Transcript 700 | Treatment record dated August 21, 2003. |
| Transcript 821 | Treatment record dated April 14, 2004. |
| Transcript 986 | Treatment record dated May 4, 2004. |
| Transcript 1092–93 | Treatment record dated May 25, 2007. |

Thus, while it is likely that Plaintiff continued to suffer from UI during the relevant time frame, the ALJ correctly commented on the absence of objective evidence regarding the impairment during the relevant time frame.  Similarly, as suggested by the ALJ's comment, Plaintiff's lack of treatment during the relevant time frame indicates that the condition is non-severe.  *See* Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995) (failure to seek medical treatment for a long time during a claimed period of disability tends to indicate tolerable pain); Williams v. Sullivan, 960 F.2d 86, 89 (8th Cir. 1992) (absence of treatment indicates that a mental impairment is non-severe); *see also* Watson v. Heckler, 738 F.2d 1169, 1173 (11th Cir. 1984) (in addition to objective medical evidence, it is proper for ALJ to consider use of pain-killers, failure to seek treatment, daily activities, conflicting statements, and demeanor at the hearing).  Additionally, even though Plaintiff has been diagnosed with UI since approximately 1994, the diagnoses alone do not establish severity.  *See, e.g.*, Salles v. Comm'r. of Social Security, 229 Fed. Appx. 140, 145 (3d Cir. 2007) (diagnoses alone, including diagnosis of depression, insufficient to establish severity at step two).

Moreover, in order for Plaintiff's UI to be found severe, Plaintiff must present evidence demonstrating that the condition significantly limited her ability to do basic work activities or impaired her capacity to cope with the mental demands of working.  *See* 20 C.F.R. §§ 404.1520(c), 404.1521(a); *see also* Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004); Salles, 229 Fed. Appx. at 145.  Plaintiff has clearly failed to carry her burden.  The record conclusively establishes that Plaintiff's UI began in 1994 when she underwent a hysterectomy, but Plaintiff worked full time from 1994 through June of 2000 (*see* Tr. 1226, Tr. 94–97).  Thus, the UI obviously did not significantly limit Plaintiff's ability to perform work.  And, when an individual has worked with an impairment, absent significant deterioration, it cannot be considered disabling. *See* Van Vickle v. Astrue, 539 F.3d 825, 830 (8th Cir. 2008) ("Thus, despite suffering from what she calls 'extreme fatigue,' Van Vickle continued working for over four years."); Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005) ("Here, the ALJ found Goff's speech impediment was not as limiting as alleged because Goff effectively worked as a nurse's aide with her speech impediment and there is no indication that her ability to speak has deteriorated since her stroke in 1997.").  Importantly, here, there is no evidence

the Plaintiff's UI deteriorated or worsened <u>through her DLI.</u>[7]  Thus, the ALJ did not err in finding Plaintiff's UI non-severe.

Plaintiff next asserts that the ALJ erred in finding her migraine headaches non-severe (Doc. 16 at 12).  Specifically, Plaintiff contends that the ALJ erred in finding that the headaches appear to have responded appropriately to medication, asserting that her sinus and ear-related headaches were an ongoing problem despite medication and surgical intervention (*id.* at 14).  In support of her assertion, Plaintiff again references numerous treatment records from the transcript (*see* Doc. 16 at 14 (referencing Tr. 144, 146, 158, 161, 185–86, 228, 239, 419, 426, 627, 638, 645, 688, 702, 704, 734, 753, 761, 849)).  As the following summary demonstrates,[8] some records referenced by Plaintiff are within the relevant time frame and some are outside of the relevant time frame (the references with an asterisk are from the relevant time frame):

| | |
|---|---|
| Transcript 185–86 | Treatment record regarding sinusitis dated February 27, 1997, and Elective Surgery Admission Orders (for a procedure related to Plaintiff's sinusitis) dated November 15, 1999. |
| Transcript 239 | Elective Surgery Admission Orders dated April 22, 1999, regarding Plaintiff's ETD. |
| Transcript 228 | Post-Anesthesia Evaluation dated April 22, 1999. |
| *Transcript 158 | Progress notes dated April 5, 2001, regarding the removal of an old, and the placement of a new, T-tube in Plaintiff's ear due to her ETD. |
| *Transcript 146 | Elective Surgery Admission Orders dated April 18, 2001, regarding the T-tube replacement. |
| *Transcript 161 | Anesthesia record dated April 18, 2001, regarding the T-tube replacement. |
| *Transcript 426 | Progress note dated April 18, 2001, regarding the replacement of Plaintiff's malfunctioning T-tube. |
| *Transcript 144 | Post-Anesthesia Care Unit Flow Sheet dated April 18, 2001, regarding the T-tube replacement. |
| *Transcript 419 | Progress note dated October 9, 2001, regarding "follow up for T- tube Placement."  As noted *supra*, during this visit Plaintiff reported |

---

[7]Plaintiff testified that the UI may have worsened in February 2004 after her left kidney was removed, but this was well after her DLI (*see* Tr. 1227).

[8]For organizational purposes the court has rearranged the order of Plaintiff's references to the Transcript.

"experiencing . . . migraine headaches every three weeks, during which she is photosensitve to light [but noted that her] headaches are sometimes relieved with saline irrigation and pheoridine." Plaintiff's prescription for pseudoephedrine was renewed, and she was advised to return for follow-up in six months regarding the T-tube replacement.[9]

| | |
|---|---|
| Transcript 645, 753[10] | Treatment record dated December 30, 2002, regarding problems with the T-tube. |
| Transcript 734 | Progress notes regarding a clinic visit on February 3, 2003, at which time Plaintiff complained of problems with the T-tube, and the physician noted that migraine headaches could not be excluded. |
| Transcript 638 | Treatment record dated April 29, 2003, regarding a consult with the neurology department.  The notes reflect Plaintiff's report of having headaches for the last six years (*see* Tr. 640).  Plaintiff also reported that Fiorinal previously provided some headache relief, but its effectiveness had ceased (*id.*).  The examining physician opined that Plaintiff "is experiencing intermittent episodes of migraine[s]," and she prescribed Imitrex injections (Tr. 641). |
| Transcript 704 | Progress notes regarding a clinic visit on August 4, 2003, at which time Plaintiff complained of problems with the T-tube, including fluid in her ear, and a report that the T-tube was "crooked."  Plaintiff did not complain of headaches. |
| Transcript 702 | Progress notes regarding a clinic visit on August 12, 2003, at which time Plaintiff complained of problems with the T-tube, but did not complain of headaches, and August 21, 2003, when Plaintiff reported no pain or headaches. |
| Transcript 688 | Treatment record dated October 19, 2003, noting Plaintiff's complaint of ear pain (it was specifically noted at this visit that Plaintiff had no headache pain). |
| Transcript 627 | Treatment record dated October 19, 2003, regarding problems with the T-tube. |

---

[9]Plaintiff returned on October 22, 2001, complaining of facial discoloration (*see* Tr. 418).  She made no mention of headaches (*see id.*)  Similarly, when Plaintiff returned on February 4, 2002, her visit concerned dermatologic abnormalities, and she made no mention of headaches (Tr. 415).  On March 21, 2002, Plaintiff returned for follow-up regarding the T-tube placement; she had "no complaints" except "occasional left fullness and itching" that was relieved with Floxin, and it was noted that Plaintiff's T-tube was "functioning well" (*id.*).

[10]Although Plaintiff cited both Transcript pages 645 and 743, the records are duplicates (*see* Tr. 643– 46; Tr. 751–53).

Transcript 849           Treatment record dated November 18, 2003, regarding some
                         blockage in Plaintiff's ear.  No headache complaints were reported.

Transcript 761           Progress notes regarding a clinic visit on December 23, 2003, at
                         which time Plaintiff complained of pain and drainage problems in the
                         ear.  No headache complaints were reported.

As can be seen from the foregoing summary, the records from the relevant time frame largely
concern the replacement of Plaintiff's T-tube in April 2001, which was a surgical procedure related
to Plaintiff's ETD.  And, while Plaintiff had ongoing problems with the T-tube, such as ear pain and
drainage, the ALJ recognized this by finding Plaintiff's ETD to be a severe impairment.  Moreover,
although Plaintiff has characterized her condition as "ear related headaches" (*see* Doc. 16 at 14), it
is evident from the treatment records that Plaintiff's ear pain related to the T-tube is different from
the migraine headaches.

Indeed, as Plaintiff's references to the transcript demonstrate, the only mention of migraine
headaches during the relevant time frame is one report by Plaintiff on October 9, 2001, that every
three weeks she was experiencing (what she described as) migraine headaches (Tr. 419).  However,
Plaintiff was not diagnosed as suffering from migraines at that time,[11] and further, she reported that
the headaches were "sometimes relieved with saline irrigation and pheoridine" (*id.*), a statement
which is generally consistent with the ALJ's finding that Plaintiff's headaches "appear to have
responded appropriately to medications" (Tr. 24).  Also consistent with the ALJ's finding are the
treatment records that follow the October 9, 2001 record.  For example, when Plaintiff returned to
the clinic on October 22, 2001, and February 4, 2002, she complained only of dermatologic
abnormalities and made no mention of headaches (Tr. 415, 418).  Similarly, on March 21, 2002,
Plaintiff returned for follow-up regarding the T-tube replacement (Tr. 415).  At that time she had
"no complaints" except "occasional left [ear] fullness and itching" that was relieved with Floxin,
and it was noted that Plaintiff's T-tube was "functioning well" (*id.*).  If Plaintiff's medications were
not providing an appropriate response to the headaches, Plaintiff would have said so during the

---

[11]As late as February 2003, Plaintiff was still was not specifically diagnosed with migraine headaches.  Indeed,
on February 3, 2003, Plaintiff's physician stated only that migraine headaches "could not be excluded" (*see* Tr. 734).
Even though the statement was made well after Plaintiff's DLI, the court notes that the statement is a far cry from a
definitive diagnosis.

follow-up office visits, or similarly, reported continued migraine headaches or problems related thereto, but she made no such reports.

Further supporting the ALJ's finding is the treatment record dated April 29, 2003 (Tr. 640). Although Plaintiff reported at that time that she had experienced headaches for the last six years, or approximately from 1997 through 2003, she also reported that Fiorinal had previously provided some headache relief (*id.*). And, while Plaintiff reported that Fiorinal's effectiveness had ceased, this report was made at the April 29, 2003 visit, which was more than nine months after Plaintiff's DLI (*see id.*). Thus, the ALJ's finding that Plaintiff's headaches were reasonably controlled with medication — through her DLI — has substantial support in the record. Moreover, much like the case with Plaintiff's UI, the record demonstrates Plaintiff's ability to work full time (i.e., from approximately 1997 through 2000) despite experiencing migraines, and there is no evidence that her condition worsened or that her medications lost their effectiveness through Plaintiff's DLI.

Lastly, in support of her argument, Plaintiff points to the opinion of Dr. Camperlengo, dated September 27, 2005, that Plaintiff's migraines and other medical conditions cause Plaintiff to be unable to maintain a job (Doc. 16 at 14 (referencing Tr. 131)). However, Dr. Camperlengo's opinion was rendered long after Plaintiff's DLI, and her opinion is based on her treatment of Plaintiff since 2003. Therefore, the opinion is not probative of Plaintiff's condition during the time frame relevant to this appeal.

In summary, the undersigned concludes that the ALJ's finding — that Plaintiff's headaches were appropriately controlled with medication during the time frame relevant to Plaintiff's claim for DIB — has substantial support in the record, and the ALJ did not err in finding that Plaintiff's migraines were a non-severe impairment.

2.      Residual Functional Capacity Determination

In related arguments, Plaintiff contends that the ALJ erred in failing to incorporate into the RFC determination any limitations with regard to Plaintiff's UI and migraine headaches (Doc. 16 at 15). RFC is an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite her impairments. *See* Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). As stated in 20 C.F.R. § 404.1545(a), it is the most a claimant can still do despite her limitations. "It is the claimant's burden, and not the Social Security Commissioner's burden, to

prove the claimant's RFC." <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001).  Although the RFC determination is a medical question, it is not based only on "medical" evidence, that is, evidence from medical reports or sources; rather, an ALJ has the duty, at step four, to assess RFC on the basis of all the relevant, credible evidence of record.  *See* <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1238 (11th Cir. 2004); <u>McKinney v. Apfel</u>, 228 F.3d 860, 863 (8th Cir. 2000) (the Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations); <u>Dykes v. Apfel</u>, 223 F.3d 865, 866–67 (8th Cir. 2000) (per curiam) (RFC is a determination based upon all the record evidence, but the record must include some medical evidence that supports the RFC finding).  *See also* 20 C.F.R. § 404.1545; Social Security Ruling 96-8p.  Lastly, impairments found non-severe are to be considered in making the RFC determination.  20 C.F.R. § 404.1523.  But, even when an ALJ finds severe impairments, it does not necessarily mean there will be functional limitations included in the RFC.  *See* <u>Walters v. Barnhart</u>, 184 F. Supp. 2d 1178, 1184 (M.D. Ala. 2001) (an ALJ's finding that plaintiff suffered from severe impairments "is not tantamount to a conclusion that these impairments imposed significant work-related limitations").

Here, the ALJ did not err in failing to include in the RFC any functional limitations related to Plaintiff's UI or migraine headaches because Plaintiff failed to carry her burden of establishing any such functional limitations.  Stated another way, the evidence of record does not support a finding of any functional limitations resulting from Plaintiff's UI or headaches during the relevant period.

With regard to Plaintiff's UI, as noted *supra*, Plaintiff was able to work full time with this condition prior to her DLI, apparently controlling the condition through the use of sanitary pads, and there is no evidence that her condition worsened <u>through her DLI</u>.  Indeed, Plaintiff's UI-related complaints, such as urgency and the need for frequent use of the restroom were generally the same before and after her DLI (*compare* Tr. 323, 501 (complaints made in 1996) *with* Tr. 821, 1092 (complaints made in 2004 and 2007)).  With regard to Plaintiff's migraines, the record reflects that Plaintiff's reports of debilitating migraine symptoms were made after her DLI (*see, e.g.*, Tr. 697, 699–700 (reports of migraine-related vomiting in August and September 2003)).  Although Plaintiff

testified at her hearing in March 2006 that she has had migraines for "close to six years" and that the migraines cause vomiting, last one to three days, and necessitate rest for up to six hours (*see* Tr. 1225–26), Plaintiff made no such report to any physician during the time frame relevant to this appeal.  Plaintiff's only report of migraines during the relevant time frame is the report she made in October 2001, and although she reported migraines and related photosensitivity symptoms at that time, the record reflects that the headaches were controlled with medication through Plaintiff's DLI. Plaintiff has therefore failed to establish, and the record similarly fails to support, the existence of any functional limitations related to her migraines that existed between June 1, 2000 and June 30, 2002, and which should have been included in the RFC.[12]  Thus, the undersigned concludes that the ALJ made a proper RFC determination, and he did so based on all of the relevant and credible evidence of record.

      C.      Credibility Findings

      Plaintiff next contends the ALJ erred in evaluating her subjective complaints of pain and other disabling symptoms (*see* Doc. 16 at 16).  As this court is well aware, pain is treated by the Regulations as a symptom of disability.  Title 20 C.F.R. § 404.1529 provides in part that the Commissioner will not find disability based on symptoms, including pain alone, ". . . unless medical signs or findings show that there is a medical condition that could be reasonably expected to produce these symptoms." *Accord* 20 C.F.R. § 416.929.  In <u>Hand v. Heckler</u>, 761 F.2d 1545, 1549 (11th Cir. 1986), the Eleventh Circuit adopted the following additional pain standard:

> There must be evidence of an underlying medical condition and (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from the condition or (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.

      The Eleventh Circuit continues to follow the <u>Hand</u> test.  <u>Wilson v. Barnhart</u>, 284 F.3d 1219 (11th Cir. 2002); <u>Kelley v. Apfel</u>, 173 F.3d 814 (11th Cir. 1999); <u>Elam v. Railroad Retirement Bd.</u>, 921 F.2d 1210, 1216 (11th Cir. 1991); <u>Holt v. Sullivan</u>, 921 F.2d 1221, 1223 (11th Cir. 1991); <u>Martin v. Railroad Retirement Bd.</u>, 935 F.2d 230, 233 (11th Cir. 1991).

---

[12]Plaintiff has functional limitations related to her ETD, such as a need to avoid noisy environments, which were included in the RFC (*see* Tr. 23).

The Eleventh Circuit has also approved an ALJ's reference to and application of the standard set out in 20 C.F.R. § 404.1529, because that regulation "contains the same language regarding the subjective pain testimony that this court interpreted when initially establishing its three-part standard." Wilson, 284 F.3d at 1226.  Thus, failure to cite to an Eleventh Circuit standard is not reversible error so long as the ALJ applies the appropriate regulation.

But "[w]hile both the Regulations and the Hand standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, neither requires objective proof of the pain itself." Elam, 921 F.2d at 1216.  The court has held that "[p]ain alone can be disabling, even when its existence is unsupported by objective evidence." Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992) (citing Walker v. Bowen, 826 F.2d 996, 1003 (11th Cir. 1987)).  However, the absence of evidence to support symptoms of the severity claimed is a factor that can be considered.  Id.; Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).

Additionally, "[i]f the Commissioner refuses to credit [subjective testimony of the plaintiff concerning pain] he must do so explicitly and give reasons for that decision. . . .  Where he fails to do so we hold as a matter of law that he has accepted that testimony as true." MacGregor, 786 F.2d at 1054; Holt, 921 F.2d at 1223.  "Although this circuit does not require an explicit finding as to credibility, . . . the implication must be obvious to the reviewing court.  The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable [the district court or this Court] to conclude that [the ALJ] considered [plaintiff's] medical condition as a whole." Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (internal quotations and citations omitted).  The reasons articulated for disregarding the plaintiff's subjective pain testimony must be based upon substantial evidence.  Jones v. Dep't of Health and Human Serv's, 941 F.2d 1529, 1532 (11th Cir. 1991).

Underlying the Hand standard is the need for a credibility determination concerning a plaintiff's complaints of pain.  Those complaints are, after all, subjective.  "[T]he ascertainment of the existence of an actual disability depend[s] on determining the truth and reliability of [a claimant's] complaints of subjective pain." Scharlow v. Schweiker, 655 F.2d 645, 649 (5th Cir. 1981) (holding that the ALJ must resolve "the crucial subsidiary fact of the truthfulness of subjective symptoms and complaints").  Claimants with objectively identical conditions can experience

significantly different levels of pain, and pain is more readily treated in some than in others. "Reasonable minds may differ as to whether objective medical impairments could reasonably be expected to produce [the claimed] pain.  This determination is a question of fact which, like all factual findings by the [Commissioner], is subject only to limited review in the courts . . . ."  Hand, 761 F.2d at 1548-49.  It is within the ALJ's "realm of judging" to determine that "the quantum of pain [a claimant] allege[s] [is] not credible when considered in the light of other evidence."  Arnold v. Heckler, 732 F.2d 881, 884  (11th Cir. 1984).   Thus, a physician may be told by a patient that he or she is in pain, and the physician may believe it, but the ALJ is not bound by that.  The evidence as a whole, including the existence of corroborating objective proof or the lack thereof, and not just a physician's belief, is the basis for the ALJ's credibility determination.

In the instant case, the ALJ recognized his duty to follow the Eleventh Circuit's pain standard, as he made reference to 20 C.F.R. § 404.1529 (see Tr. 23).  The ALJ then stated that although Plaintiff's "medically determinable impairments could have been reasonably expected to produce the alleged symptoms, . . . [Plaintiff's] statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible" (Tr. 24).

In support, the ALJ first discussed Plaintiff's complaints regarding her knee, such as her reported inability to stand or walk more than thirty minutes and her need to "lie down frequently during the day" due to swelling in the knees (Tr. 23).  In discounting these complaints, the ALJ noted that Plaintiff had no restricted range of motion in the knees, no treating physician had imposed any work-related restrictions regarding Plaintiff's right knee (the ALJ noted that Plaintiff is "status post arthroscopy of the right knee"), and recent diagnostic studies reflect only very minimal degenerative joint disease in the right knee (Tr. 24).  Indeed, x-rays from February and June of 2000 showed only "mild" to "very mild" degenerative joint disease in the right knee (Tr. 24, 372, 375). Additionally, physical examinations of the knee during the relevant time frame showed some medial joint line tenderness, but no effusion, laxity, weakness, or ligamentous instability (Tr. 446, 494). Plaintiff walked without a definite limp, was able to heel and toe walk, and was able to squat and arise again, although she did so with most of the weight on her left leg (Tr. 493–94).  On May 11, 2000, it was noted that Plaintiff had full range of motion in both knees (Tr. 460), although in November 2000 another physician opined that Plaintiff lacked five degrees of extension on range

of motion testing (*see* Tr. 494).  Objective medical evidence is a proper factor to consider in making the credibility determination, *see* 20 C.F.R. § 404.1529(c), as is a lack of physician-imposed limitations on Plaintiff's ability to perform work activities.  *See* Singleton v. Astrue, 542 F. Supp. 2d 367, 378–79 (D. Del. 2008) (in evaluating a plaintiff's credibility, ALJ did not err in considering, among other factors, that "none of [p]laintiff's treating physicians identified any specific functional limitations arising from her fibromyalgia or other conditions that would render her totally disabled"); Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (citing Brown v. Chater, 87 F.3d 963, 964–65 (8th Cir. 1996) (lack of significant restrictions imposed by treating physicians supported the ALJ's decision of no disability)).

The ALJ also considered that Plaintiff required no frequent hospitalizations or emergency room treatment for her knee problems (Tr. 24).  Indeed, the record reflects that during the relevant period Plaintiff's knee was treated conservatively with rest, physical therapy, anti-inflammatory medications, and a home exercise program (Tr. 173, 417, 419–20, 446–47, 457–58).  An ALJ may properly consider treatment that is "entirely conservative in nature" in discrediting a claimant's testimony.  Wolfe v. Chater, 86 F.3d 1072, 1078 (11th Cir. 1996).  The ALJ's findings with regard to Plaintiff's knee-related complaints, therefore, are substantially supported by the record.

With regard to Plaintiff's ETD, the ALJ noted Plaintiff's complaints, and in discounting them stated as follows:

> Treatment records demonstrate [that Plaintiff] was assessed with chronic Eustachian tube dysfunction . . . .  Her headaches, sinusitis and ear infections appear to have responded appropriately to medications.
>
> There is no objective evidence to support [Plaintiff's] subjective allegations of total disability.  She has required no frequent hospitalizations or emergency room treatment for her . . . ear infections. . . . [Plaintiff] acknowledged that she returned to work as a college class teacher in January 2005.  While this work did not rise to the level of substantial gainful activity it demonstrates [that Plaintiff] is able to engage in some type of sedentary activity.

(Tr. 24).

Indeed, the record reflects that Plaintiff was treated for chronic ETD during the relevant period, but it was controlled with treatment, including medication and the replacement of Plaintiff's T-tube.  For example, the record shows that Plaintiff complained of ear fullness and pain in March

2001, which was determined to be caused by an obstructed T-tube, but the T-tube was replaced in April 2001, and on follow up appointments Plaintiff reported that she was "doing fine" and that her "ear feels well" (Tr. 420, 436).   Although Plaintiff occasionally complained of a sensation of fullness following the T-tube replacement (*see, e.g.*, Tr. 415, 420, 423), and once complained of some itchiness, possible drainage, and a feeling of congestion, she generally had no other complaints, and an audiological evaluation in June 2001 revealed that Plaintiff's hearing was within normal limits (Tr. 419, 421).   Moreover, a treatment record dated March 21, 2002, shows that the itching and fullness earlier reported by Plaintiff were relieved with Floxin, Plaintiff had "no complaints," and the new T-tube was functioning well (Tr. 415).   Thus, the ALJ properly concluded that Plaintiff's ETD and ETD-related problems responded appropriately to treatment.   And, "[a] medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling."  Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir. 1988) (citation omitted).  *See also* Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling.") (citations and quotation omitted).

The ALJ also considered, as he did with regard to Plaintiff's knee issues, that Plaintiff had no frequent hospitalizations or emergency room treatment for ear infections.   Indeed, Plaintiff's only hospitalization was for the surgical replacement of her T-tube.   Moreover, to the extent Plaintiff has raised an issue with regard to her sinusitis (*see* Doc. 16 at 16), the court notes that during the relevant period, Plaintiff's sinusitis was treated conservatively with nasal saline rinsing and pseudoephedrine (*see, e.g.*, Tr. 443).   Additionally, although Plaintiff underwent sinus surgery in November 1999, this surgery was prior to the relevant period.   During the relevant period, on November 21, 2000, Plaintiff reported that she was doing well overall and had no new complaints other than some sinus irritation that began with recent weather changes (Tr. 443).   Similarly, on January 15, 2002, Vidyullatha Reddy-Sadda, M.D., noted that Plaintiff had chronic sinusitis and a history of chronic ear infection, but she had no new complaints at that time (Tr. 417).   The only other medical evidence regarding sinusitis during the relevant period is a letter authored by Michael A. Hagmann, M.D., on April 26, 2001, written "To Whom it May Concern" (Tr. 142).   Dr. Hagmann noted that he first saw Plaintiff on April 9, 2001, for chronic sinusitis (*id.*).   He further noted that Plaintiff had undergone several sinus surgeries, most recently in 199[9], and it was his "opinion that

her condition of sinusitis can be traced back to 1991 when she was in the military" and that her sinusitis is chronic and is the same condition that was treated during her military service" (*id.*). Dr. Hagmann's letter, then, establishes that Plaintiff's sinusitis is long-term and ongoing, yet Plaintiff was clearly able to work full time with the condition from 1994 through June of 2000, even when Plaintiff underwent one or more surgeries for the condition (*see* Tr. 1226, Tr. 94–97). During the relevant time, Plaintiff had no such surgeries, and there is no evidence to suggest that her condition worsened through her DLI. Indeed, Dr. Hagmann's letter suggests otherwise.

As an additional reason for generally discounting Plaintiff's allegations, the ALJ noted that Plaintiff worked part time in 2005 (Tr. 24). Plaintiff contends the ALJ improperly considered this factor because her work as a part-time instructor during the school term, teaching two classes each quarter and earning about $7,6000 a year (*see* Tr. 1220), does not "demonstrate that she can engage in competitive, gainful [full-time] employment" (Doc. 16 at 16). The undersigned finds that the ALJ did not err in considering this factor. *See* 20 C.F.R. § 404.1571 (even if work does not rise to the level of SGA, it may show that a claimant is able to do more work than what was actually performed); Wolfe, 86 F.3d at 1078 (in discounting Plaintiff's complaints of pain, ALJ did not err in considering fact that claimant worked washing mobile homes during the adjudicated period); Harris v. Barnhart, 356 F.3d 926, 930 (8th Cir. 2004) ("It was also not unreasonable for the ALJ to note that Harris's . . . part-time work [was] inconsistent with her claim of disabling pain."). Moreover, this was but one factor the ALJ considered in his overall evaluation of Plaintiff's credibility.

It is within the ALJ's province to determine credibility and, in fulfilling that function, the ALJ is entitled to consider inconsistencies between a claimant's subjective complaints and the evidence of record. *See* Wolfe, 86 F.3d at 1079 ("The ALJ's task is to examine the evidence and resolve conflicting reports."); Carnes, 936 F.2d at 1219 (11th Cir. 1991) (holding that "the credibility of witnesses is for the Secretary to determine, not the courts."). While any one of the above inconsistencies alone might not be enough to find Plaintiff's subjective complaints not credible, certainly the totality of the inconsistencies provide, at the very least, substantial evidence supporting the ALJ's decision that Plaintiff was not credible. And, because the ALJ articulated the inconsistencies on which he relied in discrediting Plaintiff's testimony regarding her subjective

complaints, and because his credibility finding is supported by substantial evidence on the record as a whole, the ALJ's credibility finding should be affirmed.  *See* Foote, 67 F.3d at 1562; MacGregor, 786 F.2d at 1054.

       D.        ALJ's Findings at Step Five

As her last ground for relief, Plaintiff contends that the ALJ's step-five determination is erroneous because it conflicts with the ALJ's finding at step four and is based on "unsupported vocational testimony" (Doc. 16 at 17).  Because the ALJ's findings at steps four and five are based on the testimony of a vocational expert ("VE") (*see* Tr. 24–25), it is helpful to summarize the VE's testimony before addressing Plaintiff's argument.

The VE first classified Plaintiff's past and present jobs as follows: supply officer (sedentary, Specific Vocational Preparation ("SVP") level 7, skilled), teacher (light, SVP 7, skilled), and agricultural specialist (light, SVP 8, skilled) (Tr. 1232–33).[13]

Next, the VE testified in response to the ALJ's hypothetical question regarding an individual with Plaintiff's age, education, and past relevant work and vocational profile who can perform:

> [S]edentary work with no continuous, repetitive pushing or pulling in the lower extremities. Would need to sit and stand during the day as comfort dictates; occasionally stoop or crouch; no kneeling or crawling; hearing due to hearing loss would need to be in a quiet like office setting or restaurant setting or fast food restaurant off hours; no exposure to the weather, extreme heat or cold or wetness and humidity; no noisy environments that would have an impact on her hearing as indicated earlier; no vibrating surfaces or objects; no exposure to moving mechanical parts, electrical shock, or high places.  It also would need to be near a restroom which would require maybe additional restroom breaks once to twice a day for up to 10 minutes.

(Tr. 1233).  The VE testified that the hypothetical individual would not be able to perform any of Plaintiff's past relevant work, noting that the supply officer job would be in a "moderate environment in terms of noise," and the bathroom breaks would be "problematic" for all jobs (Tr. 1234).  When asked whether "there would be any sedentary jobs that are unskilled or that would be skilled at a lower level that would use transferable skills from her work," the VE stated that there "are some semi-skilled jobs that would utilize worker <u>traits</u> as well as some of the <u>skills</u>," but the

---

[13]Semi-skilled work corresponds to an SVP of 3–4, and skilled work corresponds to an SVP of 5–9 in the DOT. SSR 00-4p.

VE testified that he continued to have a problem with the limitation regarding bathroom breaks (Tr. 1233–34) (emphasis added).

The ALJ then asked the VE to consider the same hypothetical question with the elimination of the bathroom break limitation (Tr. 1234).  The VE testified that under the modified hypothetical question — not including the additional bathroom breaks — an individual would be able to perform work as a referral and information clerk (sedentary, SVP 3, semi-skilled), a maintenance clerk (sedentary, SVP 3, semi-skilled), and a maintenance scheduler (sedentary, SVP 3, semi-skilled) (Tr. 1234).  No job category numbers corresponding to the <u>Dictionary of Occupational Titles</u> ("DOT") were provided, but the VE stated that his testimony was consistent with the DOT (Tr. 1234–35).  Finally, the VE testified that the individual would also not be able to sustain work if she had to miss three or more days on a regular but unpredictable basis (Tr. 1234–35).  Plaintiff's attorney was provided with an opportunity to question the VE, but he declined (*see* Tr. 1235).

Based on the foregoing testimony, the ALJ found at step four that Plaintiff was unable to perform her past relevant work as a supply officer, teacher, or agricultural specialist through her DLI (Tr. 24).  The ALJ found at step five that Plaintiff could perform other work available in the economy, such as a referral clerk, maintenance clerk, and maintenance scheduler (Tr. 25).

While Plaintiff's argument is somewhat unclear, Plaintiff appears to first assert that the ALJ erred because the VE's testimony in response to the first hypothetical question suggests that Plaintiff would be able to perform her past relevant work — if she did not need to take frequent restroom breaks — but this was the only limitation omitted in the second hypothetical; therefore, if the ALJ found that Plaintiff did not need frequent restroom breaks, he should have found her capable of performing her past relevant work (at step four) and other available work (at step five) (*see* Doc. 16 at 17).  Conversely, if Plaintiff indeed needed frequent restroom breaks, she would be precluded from all employment.  Plaintiff therefore contends the ALJ's findings at steps four and five are inconsistent.

It is clear from a reading of the decision of the ALJ and the testimony of the VE that the ALJ concluded that Plaintiff did not need frequent restroom breaks (*see* discussion*, supra*, in Sections V.B.1 and 2 (including discussions regarding Plaintiff's ability to work full time with UI, the lack of evidence demonstrating deterioration of Plaintiff's UI through her DLI, and Plaintiff's use of

sanitary pads); *see also* Tr. 23).  And, given this finding, it would appear that the ALJ could have found Plaintiff "not disabled" at either step four or step five based on the VE's testimony.  Although the ALJ's finding of "not disabled" was made only at step five, there is no error.  *See* 20 C.F.R. § 404.1520(a)(4)(iv)–(v) (if Plaintiff can perform either her past relevant work or other work, she is not disabled under the Act).

Plaintiff additionally contends that the ALJ erred in relying on the VE's testimony that Plaintiff could perform the three semi-skilled jobs he identified (Doc. 16 at 17–18).  Specifically, Plaintiff contends that "there is no evidence that [Plaintiff] had skills that would transfer to any of [the] three jobs," and before the Commissioner can deem Plaintiff able to perform these jobs, the Commissioner must first establish that she has transferable skills that can transfer to the named occupations (*id.* at 18).  In support, Plaintiff cites Social Security Ruling ("SSR") 82-41 (defining "trait" as "the acquired capacity to perform the work activities with facility (rather than the traits themselves) that gives rise to potentially transferable skills");[14] SSR 83-10 (concerning the use of the Medical Vocational Rules (the "grids")); and 20 C.F.R. § 404.1568(d) (which defines "transferable skills," explains how the Commissioner determines skills that can be transferred, and describes varying degrees of transferability) (*id.*).

Initially, Plaintiff's reliance in SSR 83-10 is misplaced.  SSR 83-10 concerns the application of the grids in making a determination at step five.  And, in such a case, the ALJ makes the step-five determination without the assistance of a VE.  In this case the ALJ obtained testimony from a VE who considered Plaintiff's past relevant work, and in response to the hypothetical question containing limitations found credible by the ALJ, he identified three specific jobs Plaintiff could perform.  Plaintiff further contends, however, that the VE erred by his use of the word "traits" because worker "traits" are not the same as transferable skills (Doc. 16 at 17–18).  However, the VE specifically testified that Plaintiff had the work traits and skills necessary to perform the other work he identified (Tr. 1234).  Thus, the VE considered both traits and skills.

Plaintiff also alleges that the VE failed to identify the nature of the transferable skill(s) and filed to establish the transferability of the skill(s) to the new jobs (Doc. 16 at 18).  The undersigned

---

[14]Plaintiff cites SSR 82-41, apparently, to point out that "traits" are different from "skills."

concludes that Plaintiff is not entitled to relief on this ground.  First, the ALJ was justified in relying on the VE's testimony in finding Plaintiff not disabled.   The VE is a specialist regarding employment, and as a specialist, is knowledgeable of the skills necessary for performing jobs listed in the DOT as well as the vocational factors which influence employment, and the ALJ properly relied on the VE's testimony to determine that Plaintiff could perform other work existing in significant numbers in the national economy.  *See* 20 C.F.R. § 404.1566(e) (VEs may be used for resolving complex issues, such as whether work skills can be used in other work and the specific occupations in which they can be used); SSR 00-4p (VEs are used at steps four and five to resolve "complex vocational issues"); <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1240 (11th Cir. 2004) (noting that a VE is "an expert on the kinds of jobs an individual can perform based on his or her capacity and impairments").  Second, the Regulations provide that transferability of skills to other jobs "is most probable and meaningful" among jobs in which, among other things, the same or lesser degree of skill is required.  20 C.F.R. § 404.1568(d)(2).  And here, each of Plaintiff's past relevant jobs were characterized as skilled with an SVP of seven or eight, but the jobs the ALJ found Plaintiff capable of performing are all unskilled with SVPs of three.  Third, Plaintiff was represented by counsel at the administrative hearing, and her counsel — after hearing the VE's testimony, including his use of the word "trait" and his comment regarding Plaintiff's "skills" — was provided with an opportunity to question the VE but declined to do so, apparently concluding that the VE's testimony did not warrant adversarial development.  *See* <u>White v. Astrue</u>, 240 Fed. Appx. 632, 634 (5th Cir. 2007)[15] ("Because the VE's testimony, which White did not challenge through cross-examination, was elicited by hypothetical questions incorporating the RFC determination, [the ALJ's] reliance [on the VE's testimony identifying a number of occupations White could perform] was proper) (citations omitted); *see also* <u>Carey v. Apfel</u>, 230 F.3d 131, 146–47 (5th Cir. 2000) ("claimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial

---

[15]The undersigned recognizes that <u>White</u> is not considered binding precedent since it is unpublished, *see* 11th Cir. R. 36-2, and discusses the case only as persuasive authority.

development in the administrative hearing").  Plaintiff, therefore, is not entitled to relief, as the ALJ did not err at step five of the sequential evaluation.

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed.  42 U.S.C. § 405(g); <u>Lewis</u>, 125 F. 3d at 1439; <u>Foote</u>, 67 F.3d at1560. Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.

At Pensacola, Florida this <u>18</u><sup>th</sup> day of June 2009.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


## <u>NOTICE TO THE PARTIES</u>

**Any objections to these proposed recommendations must be filed within ten days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**